\UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------X
CHAOHUI TANG, JIANLIN LI, QINGZE LIU, JIAN LIU,
*on behalf of themselves and all others similarly situated,*


            Plaintiffs,                      **REPORT & RECOMMENDATION**
                                                **14 CV 390 (JBW)(LB)**


    -against-


WING KEUNG ENTERPRISES, INC. and
KEUNG CHANG,

            Defendants.
-------------------------------------------------------------------------X
**BLOOM, United States Magistrate Judge:**

      Plaintiffs bring this case alleging that their former employer violated the minimum wage and overtime provisions of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 et seq., and the minimum wage and overtime provisions as well as the Wage Theft Prevention Act of Article 19 of the New York Labor Law ("NYLL"), by failing to pay them the required overtime and minimum wages. Following discovery, defendants filed a motion for summary judgment claiming that plaintiffs were exempt from the overtime provision of the FLSA under the Motor Carrier Act (MCA). (ECF No. 13, 22.) Plaintiffs opposed the motion. (ECF Nos. 15-21.) During briefing of the summary judgment motion, defendants produced plaintiff employees' time records, which plaintiffs alleged were falsified. Judge Weinstein held defendants' motion for summary judgment in abeyance and referred plaintiffs' claim that the records were falsified to me, as well as plaintiffs' claims that this case should proceed as a collective action. Plaintiffs moved for preliminary certification of a FLSA collective action. (ECF Nos. 31-38; 45.) Defendants opposed the motion. (ECF Nos. 42-44.)

Following a hearing, I found that plaintiffs had not established that defendants had falsified the time records. Further, I denied plaintiffs' motion for certification of a collective action, holding that plaintiffs had not made the required modest factual showing that plaintiffs and the potential opt-in plaintiffs were sufficiently similarly situated. (ECF No. 52.)

With defendants' motion for summary judgment still pending, plaintiffs cross-moved for summary judgment. Plaintiffs contend that they are entitled to summary judgment because they are not exempt under the Motor Carrier Act and again allege that the "time sheets" kept by defendants were falsified. (ECF No. 54, 55, 56, 57, 62.)[1] Defendants opposed plaintiffs' cross-motion. (ECF No. 58.) Judge Weinstein held a hearing on the parties' motions for summary judgment and referred specific questions to me for a Report and Recommendation, pursuant to 28 U.S.C. § 636(b), to determine whether the case is governed by the Motor Carrier Act exemption. (ECF No. 75.) For the following reasons, defendants' motion for summary judgment should be granted in part and denied in part. Defendants have demonstrated that certain plaintiffs were exempt under the Motor Carrier Act for certain time periods. Plaintiffs' cross-motion for summary judgment should be denied.

## I.     Standard of Review

"Summary judgment is proper only when, construing the evidence in the light most favorable to the non-movant, 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" Doninger v. Niehoff, 642 F.3d 334, 344 (2d Cir. 2011) (quoting Fed. R. Civ. P. 56(a)).  A fact is material if it is one that "might affect the outcome of the suit under the governing law . . . ." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  "An issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return

---

[1] Plaintiffs' Memorandum of Law is filed at ECF No. 54.

a verdict for the nonmoving party.'"  McCarthy v. The Dun & Bradstreet Corp., 482 F.3d 184,

202 (2d Cir. 2007) (quoting Anderson, 477 U.S. at 248).  "The trial court's function in deciding

such a motion is not to weigh the evidence or resolve issues of fact, but to decide instead

whether, after resolving all ambiguities and drawing all inferences in favor of the non-moving

party, a rational juror could find in favor of that party."  Pinto v. Allstate Ins. Co., 221 F.3d 394,

398 (2d Cir. 2000); see also Baker v. Home Depot, 445 F.3d 541, 543 (2d Cir. 2006) (resolving

all ambiguities and drawing all inferences in favor of the nonmoving party on summary

judgment). The moving party bears the initial burden of establishing that there are no material

facts in dispute and must provide "affirmative evidence" from which a jury could return a verdict

in its favor. Anderson, 477 U.S. at 257.  Then "the burden shifts to the non-movant to point to

record evidence creating a genuine issue of material fact."  Salahuddin v. Goord, 467 F.3d 263,

273 (2d Cir. 2006) (citing Fed. R. Civ. P. 56(e)).  Mere conclusory allegations are insufficient,

and "[t]here must be more than a 'scintilla of evidence'" to defeat a motion for summary

judgment. Del. & Hudson Ry. Co. v. Consol. Rail Corp., 902 F.2d 174, 178 (2d Cir. 1990)

(quoting Anderson, 477 U.S. at 252).

   The same standard applies to cross-motions for summary judgment. See Morales v. Quintel

Entm't, Inc., 249 F.3d 115, 121 (2d Cir. 2001); Parker Hannifin Corp. v. N. Sound Properties,

2013 WL 1932109, at *6 (S.D.N.Y. May 8, 2013) ("[W]hen cross motions for summary

judgment are made, the standard is the same as that for individual motions."). The court should

consider "each motion independently of the other and, when evaluating each, the court must

consider the facts in the light most favorable to the non-moving party." United Indus. Corp. v.

IFTE plc, 293 F.Supp.2d 296, 299 (S.D.N.Y. 2003) (citing Morales, 249 F.3d at 121).

Unless otherwise noted, the facts described herein are undisputed and are supported by admissible evidence. See Vt. Teddy Bear Co. v. 1-800 Beargram Co., 373 F.3d 241, 244 (2d Cir. 2004) ("[The Court] must be satisfied that the citation to evidence in the record supports the assertion."). As permitted by Rule 56(e) of the Federal Rules of Evidence and 28 U.S.C. § 1746, the Court relies in part upon sworn affidavits setting forth admissible facts based on personal knowledge and unsworn, written declarations "subscribed . . . as true under penalty of perjury, and dated."

Defendants failed to file a Rule 56.1 Statement of Material Facts as required on a motion for summary judgment. Plaintiffs argue that defendant's failure to include a Rule 56.1 statement is sufficient to deny defendants' motion in its entirety. While the failure to file the statement could be the basis to deny the motion, "[a] district court has broad discretion to determine whether to overlook a party's failure to comply with local court rules." Holtz v. Rockefeller & Co., Inc., 258 F.3d 62, 73 (2d Cir. 2001) (citing Wight v. Bankamerica Corp., 219 F.3d 79, 85 (2d Cir. 2000)). "[W]hile a court is not required to consider what the parties fail to point out' in their Local Rule 56.1 statements, it may in its discretion opt to 'conduct an assiduous review of the record" even where one of the parties has failed to file such a statement." Id (quoting Monahan v. New York City Dep't of Corrections, 214 F.3d 275, 292 (2d Cir. 2000)). "The purpose of Local Rule 56.1 is to streamline the consideration of summary judgment motions by freeing district courts from the need to hunt through voluminous records without guidance from the parties….The local rule does not absolve the party seeking summary judgment of the burden of showing that it is entitled to judgment as a matter of law, and a Local Rule 56.1 statement is not itself a vehicle for making factual assertions that are otherwise unsupported in the record." Holtz, 258 F.3d at 74 (internal citation omitted).

## II.     On What Basis Does the MCA Exemption Apply: Day by Day, Truck by Truck, or for Particular Periods of Time?

Defendant Wing Keung is a wholesale grocer that distributes food products, including fresh produce and refrigerated food, and restaurant supplies to restaurants primarily in New York, New Jersey, and Connecticut. (Spindler Aff. at ¶¶ 5, 9 (ECF No. 13-1).) Wing Keung owns and operates approximately eighteen trucks. (Id. at ¶ 6.) Plaintiffs worked for defendants as both truck drivers and loaders. The FLSA provides that any employer who satisfies certain jurisdictional and statutory criteria must pay its employees overtime wages at "one and one-half time the regular rate at which [the employee] is employed" for each hour worked over forty hours in a given week. 29 U.S.C. § 207. The overtime provision of the FLSA is subject to a number of exemptions, including the Motor Carrier Act ("MCA") exemption, which states that the overtime provision of the FLSA shall not apply to "any employee with respect to whom the Secretary of Transportation has power to establish qualifications and maximum hours of service." 29 U.S.C. § 213(b)(1). Many courts have struggled to define the scope of the MCA exemption, specifically in cases where an employee is classified as a "loader" by the employer.

The exemption contained in 29 U.S.C. § 213(b)(1) does not define its own contours, but rather defines its scope by reference to the MCA, contained in 49 U.S.C. § 31502. The MCA grants the Department of Transportation (DOT) regulatory power over the qualifications and maximum hours of service of employees of "a motor private carrier, when needed to promote safety of operation." 49 U.S.C. § 31502(b)(2); see also Bilyou v. Dutchess Beer Distrib. Inc., 300 F.3d 217, 222 (2d Cir. 2002) (describing the scope of the exemption prior to recent amendments). The overtime provision of the New York Labor Law (NYLL) parallels the FLSA overtime provision and the NYLL has also incorporated the MCA exemption by reference. 12

N.Y.C.R.R. § 142.2.2. Thus, if an employee falls within the MCA exemption, the employee is exempt from both the FLSA and the NYLL overtime provisions.

### a) Activities of the Employer: Whether Defendant is a "Motor Carrier"

Exemptions to the FLSA "are to be narrowly construed against the employers seeking to assert them and their application limited to those establishments plainly and unmistakably within their terms and spirit." Arnold v. Ben Kanowsky, Inc., 361 U.S. 388, 392 (1960). The defendant bears the burden of proving that an exemption to the FLSA applies. Id. at 222.  In determining whether a particular employee is covered by the MCA exemption, both the activities of the employer and the activities of the employee are considered. First, in order for the employee to fall within the exemption, the employer must either be a "motor carrier" or a "motor private carrier" as defined within the Act. "The term 'motor carrier' means a person providing motor vehicle transportation for compensation." 48 U.S.C. § 13102 (14).  Whereas, a "motor private carrier" refers to "a person, other than a motor carrier transporting property by motor vehicle" when "the person is the owner, lessee, or bailee of the property being transported; and the property is being transported for sale, lease, rent, or bailment or to further a commercial enterprise." 48 U.S.C. § 13102 (15). Additionally, with a motor private carrier, the property can be moved either intrastate or interstate, although if the transportation is interstate, it still must be between locations in the United States or along a public highway. 48 U.S.C. § 13102 (15); 49 U.S.C § 13501. Even if all those requirements are met, the exemption will *not* apply if the employer falls within the "Small Vehicle Exception." The Small Vehicle Exception to the motor carrier exemption was adopted in the SAFETEA-LU Technical Corrections Act of 2008 ("TCA"), Pub. L. 110-244, Title III, § 306. Under the amendment, an employee does not fall

within the MCA exemption if he or she "performs duties on motor vehicles weighing 10,000 pounds or less." P.L. 110-244, Title III, § 306(c).[2]

### b) Was Employee Engaged in "Safety Affecting Activities" in Interstate Commerce

If the employer is a "motor carrier" or "motor private carrier," the inquiry then turns to the job responsibilities of the specific employee. Many courts, finding a lack of guidance in the MCA itself, turn to the interpretive bulletins and opinions issued by the Department of Labor (DOL). Here, at the outset, it is important to note that the DOL has never been delegated any authority to define the scope of the MCA exemption; that is the responsibility of the Secretary of Transportation, and the DOT has authority to define the scope of the MCA exemption, not the DOL. See Khan v. IBI Armored Services, Inc., 474 F. Supp. 2d 448, 456 n. 8 (E.D.N.Y. 2007) (citing Troutt v. Stavola Bros., Inc., 107 F.3d 1104, 1108 n. 1 (4th Cir. 1997)) ("Given the dearth of caselaw addressing 'loaders,' there is, of course a temptation to grasp onto any authority that can be found, but the Department of Labor's opinions on this issue are not entitled to any special deference."); see also Qi Zhang v. Bally Produce, Inc., No. 12-CV-1045 (FB)(JMA), 2013 WL 1729274, at *1, n. 2 (E.D.N.Y. April 22, 2013) ("The DOL's views regarding the Motor Carrier Exemption are not entitled to any special deference. Here, I rely on the DOL's interpretive bulletin only to outline the general contours of the Motor Carrier Exemption, not to definitively interpret it.") (internal citation omitted). While the DOL opinions are not entitled to any special deference by the court, the DOL opinions summarize and synthesize Supreme Court case law on the MCA exemption and therefore offer guidance.

Specifically, the DOL has issued an interpretive bulletin, explaining that, in order for the MCA to apply, an employee must "engage in activities of a character directly affecting the safety

---

[2] The wording of TCA focuses on the employee. However, the TCA does not apply if all of the employer's motor vehicles weigh more than 10,000 pounds. If the employer operates a mixed fleet of vehicles of various weights, then the Court must inquire regarding the weight of the specific vehicle(s) the employee worked on.

of operation of motor vehicles in the transportation on the public highways of passengers or

property in interstate or foreign commerce within the meaning of the Motor Carrier Act." 29

C.F.R. § 782.2(a).[3] "There are four broad categories of workers whose duties are said to directly

affect the safety of vehicle operation: drivers, mechanics, loaders, and helpers of the first three."

Fox v. Commonwealth Worldwide Chauffeured Transp. of NY, LLC, 865 F.Supp.2d 257, 266

(E.D.N.Y. 2012) (citing Levinson v. Spector Motor Serv., 330 U.S. 649 (1947)). If not all of the

employee's activities fall into one of these categories, a court must examine "the character of the

activities rather than the proportion of either the employee's time or his activities." Morris v.

McComb, 332 U.S. 422, 431-32 (1947) (internal quotation marks and citation omitted).

While the court considers the title of the employee's position and the name given to the

work he performs, this is not controlling. See 29 C.F.R. § 782.2(b)(2); Pyramid Motor Freight

Corp. v. Ispass, 330 U.S. 695 (1947).  Rather, "what is controlling is the character of the

activities involved in the performance of his job." 29 C.F.R. § 782.2(b)(2). The issue then

becomes how often an employee must engage in "safety-affecting activities" in interstate

commerce in order to fall within the exemption. Incorporating the holdings of Supreme Court

cases on the Motor Carrier exemption, the DOL's guidance has been followed by the courts:

> As a general rule, if the bona fide duties of the job performed by the employee are
> in fact such that he is (or, in the case of a member of a group of drivers, driver's
> helpers, loaders, or mechanics employed by a common carrier and engaged in
> safety-affecting operations, *that he is likely to be*) called upon in the ordinary
> course of his work to perform, either regularly or from time to time, safety-
> affecting activities of the character described in paragraph (b)(2) of this section,
> he comes within the exemption in all workweeks when he is employed at such
> job. This general rule assumes that the activities involved in the continuing duties
> of the job in all such workweeks will include activities which have been
> determined to affect directly the safety of operation of motor vehicles on the
> public highways in transportation in interstate commerce. Where this is the case,
> the rule applies regardless of the proportion of the employee's time or of his

---

[3] Despite being included within the Code of Federal Regulations, Part 782 of Title 29 is not a set of legally binding
regulations, but rather an interpretive bulletin by the DOL.

activities which is actually devoted to such safety-affecting work in the particular workweek, and the exemption will be applicable even in a workweek when the employee happens to perform no work directly affecting "safety of operation." On the other hand, where the continuing duties of the employee's job have no substantial direct effect on such safety of operation or where such safety-affecting activities are so trivial, casual, and insignificant as to be de minimis, the exemption will not apply to him in any workweek so long as there is no change in his duties. If in particular workweeks other duties are assigned to him which result, in those workweeks, in his performance of activities directly affecting the safety of operation of motor vehicles in interstate commerce on the public highways, the exemption will be applicable to him those workweeks, but not in the workweeks when he continues to perform the duties of the non-safety-affecting job.

29 C.F.R. § 782.2(b)(3) (emphasis added) (internal citations omitted). The inquiry whether the

exemption applies is therefore fact intensive and specific to the employee. If an employee falls

into the category of drivers, driver's helpers, loaders, or mechanics, then the inquiry becomes

whether the employee "*is likely to be* called upon in the ordinary course of his work to perform,

either regularly or from time to time, safety-affecting activities." The standard for employees

within these groups is different because, as the Supreme Court recognized in Levinson, "the

activities of [these groups].… affect the safety of operation of motor vehicles in interstate or

foreign commerce." Levinson, 330 U.S. at 669; see Khan v. IBI Armored Services, Inc., 474 F.

Supp. 2d 448, 457 n. 10 (E.D.N.Y. 2007) ("Though it is obvious to the point of almost being

susceptible of proof by judicial notice, the loading or rearrangement of cargo on a truck is

obviously related to the safe operation of that vehicle on a highway.…Therefore, the Court

concludes as it must that, in accord with Levinson, the proper loading of [a]…vehicle directly

affects the safe operation of such vehicles on the highway and [] employees who actually 'load'

them fall within the Motor Carrier Exemption."); see also McBeth v. Gabrielli Truck Sales, Ltd.,

768 F. Supp. 2d 383, 390 (E.D.N.Y. 2010) ("The Department of Labor interprets the motor

carrier exemption to apply to drivers, driver's helpers, loaders, or mechanics whose work directly

affects the safety of operation of vehicles on the public highways in transportation in interstate or foreign commerce within the meaning of the MCA.").

Therefore, if an employee is properly classified as a driver or a loader, he certainly falls within the Motor Carrier Act exemption for those weeks when he is in fact either driving or loading vehicles involved in interstate transportation. Further, consistent with the DOL guidance integrating Supreme Court rulings, district courts hold that where "interstate travel constitutes a 'natural, integral, and inseparable part' of the employee's duties, such that any employee is *likely to be called* on to perform interstate travel, the employees are all subject to the motor carrier exemption while they fill that position regardless of the actual number of hours they individually devote to interstate travel." Dauphin v. Chestnut Ridge Transp., Inc., 544 F. Supp. 2d 266, 274-75 (S.D.N.Y. 2008) (emphasis added) (citing McComb, 332 U.S. at 433); see also D'Arpa v. Runway Towing Corp., No. 12-CV-1120 (JG), 2013 WL 3010810, at *8 (E.D.N.Y. June 18, 2013), Fox v. Commonwealth Worldwide Chauffeured Transp. of NY, LLC, 865 F. Supp. 2d 257, 266 (E.D.N.Y. 2012).

### c) Activities of the Employee: Time Period to Consider

As an employee's duties may vary, (even within the same job description), it is necessary to look at particular periods of employment – both to consider whether the employee is engaged in "safety affecting" activities and whether those activities specifically affect motor vehicles in interstate commerce. The DOL propounds a "week by week" approach:

> If in particular workweeks other duties are assigned to [the employee] which result, in those workweeks, in his performance of activities directly affecting the safety of operation of motor vehicles in interstate commerce on the public highways, the exemption will be applicable to him those workweeks, but not in the workweeks when he continues to perform the duties of the non-safety-affecting job.

10

29 C.F.R. § 782.2(b)(3). The Supreme Court also utilized this approach when it considered the job responsibilities of the employees in Morris v. McComb, 332 U.S. 422 (1947), and looked at the number of interstate trips the employees took per week.[4] Following Morris and the DOL guidance, courts generally look at the responsibilities the employee could be expected to perform week by week. See e.g. Osorio v. Mathews Prime Meats, Inc., 101 F.Supp.3d 255 (E.D.N.Y. 2015); Mason v. Ecolab, Inc., No. 04 Civ. 4488 (MBM), 2005 WL 2000133 (S.D.N.Y. Aug. 17, 2005).

   The final requirement for the MCA exemption to apply is that the employee's work must affect the safety of operation of motor vehicles *in interstate commerce*. There are two ways to establish that the employee had sufficient involvement in interstate commerce. First, as mentioned above, if interstate travel is a "natural, integral, and inseparable part of the employee['s] duties." Dauphin, 544 F. Supp. 2d at 274-75; see also Williams v. Tri-State Biodiesel, LLC, No. 13-CV-5041, 2015 WL 305362, at *7 (S.D.N.Y. Jan. 23, 2015). Some district courts have held that even employees who do not drive or load vehicles on any interstate routes, or only work very few interstate routes, still fall within the exemption if they *could have* received the interstate route as a natural part of their duties. See Roberts v. Cowan Distrib. Servs., LLC, Civ. No. 3:13 cv 766 (DJN), 2014 WL 5811067, at *13 (E.D.Va. Nov. 11, 2014); see also Badget v. Rent-Way, Inc., 350 F. Supp. 2d 642, 656-57 (W.D. Pa. 2004) (finding employees within the exemption "regardless of the number of interstate/intrastate trips they actually made because, at all relevant times, they could have been called upon in the regular course of their employment to make trips affecting interstate commerce") (emphasis omitted), accord Masson v. Ecolab, Inc., No. 04 Civ. 4488 (MBM), 2005 WL 2000133, at *8 (S.D.N.Y.

---

[4] While the Morris Court broke down the number of interstate trips each driver made per week, it ultimately found that a group of drivers who drove interstate trips only 4 percent of their time were exempt under the MCA because the interstate trips were an expected and inseparable part of the employees' duties. Morris, 332 U.S. at 433.

Aug. 17, 2005). The focus of the Court's inquiry is on what duties the employee was expected to perform within a given week and whether he was "likely to be called upon" to perform work affecting the operation of motor vehicles in interstate commerce within that week.

The second method courts employ is to consider whether the employee was responsible for goods involved in a "continuity of movement in the flow of interstate commerce." Cruz v. AAA Carting and Rubbish Removal, Inc., 116 F. Supp. 3d 232, 247 (S.D.N.Y. 2015) (quoting Bilyou v. Dutchess Beer Distrib., Inc., 300 F.3d 217, 223 (2d Cir. 2002) ("Second, even if an employee transports the goods wholly intrastate, the exemption may apply if the goods 'are involved in a practical continuity of movement in the flow of interstate commerce.'"). "If the shipper's fixed and persisting transportation intent at the time of interstate shipment was to deliver an item to a specified customer who had ordered the item, regardless of whether it was stored temporarily intrastate, the motor carrier exemption applies. On the other hand, the exemption does not apply where items are delivered from out of state to an intrastate location, such as a warehouse, for future delivery to customers yet to be identified. In other words, the exemption is inapplicable where the final destination of any shipment is not decided until after the goods had come to rest in the warehouse." Masson v. Ecolab, Inc., No. 04 Civ. 4488 (MBM), 2005 WL 2000133, at *3 (S.D.N.Y. Aug. 17, 2005) (alteration, citations, and internal quotation marks omitted).

Finally, once the employee's activities and relationship to interstate commerce have been considered, courts may apply the *de miminis* rule which states that "where the continuing duties of the employee's job have no substantial direct effect on such safety of operation or where such safety-affecting activities are so trivial, casual, and insignificant as to be *de minimis*, the exemption will not apply to [the employee] in any workweek so long as there is no change in his

duties." 29 C.F.R. § 782.2(b)(3); see e.g. Osorio v. Mathews Prime Meats, Inc., 101 F. Supp. 3d

255, 261 (E.D.N.Y. 2015).

> It appears that courts refer to '*de minimis*' activities for three possible purposes: (1) to find that the employee's activities in relation to safety in interstate commerce may be so trivial as to take the employee out of the motor carrier exemption; (2) to permit an employer to take advantage of the motor carrier exemption on the mere showing that the employee's activities in relation to safety in interstate commerce are more than *de minimis*; and (3) to refuse to apply the motor carrier exemption altogether if it can be shown that the employer's activities in interstate commerce are *de minimis* in relation to the employer's activities overall.

Williams, 2015 WL 305362, at *12, accord Osorio, 101 F. Supp. 3d at 262. Therefore, if the

employee's activities in relation to safety in interstate commerce are merely trivial or the

employer overall engages in so little interstate commerce as to be *de minimis*, the Court may

properly find that the employee is not exempt under the MCA.

### III.    Analysis

#### a.    Was Defendant a "Motor Carrier" within the Meaning of the Act?

Wing Keung is clearly a "motor private carrier" within the meaning of the MCA. The

plain text definition of "motor private carrier" under the Motor Carrier Act simply refers to "a

person, other than a motor carrier transporting property by motor vehicle" when "the person is

the owner, lessee, or bailee of the property being transported; and the property is being

transported for sale, lease, rent, or bailment or to further a commercial enterprise." 48 U.S.C. §

13102 (15). While the presence and extent of interstate travel is relevant to the inquiry into the

particular employee's activities, it is not at all relevant in determining whether defendant

qualifies as a "motor private carrier." The property moved by the motor private carrier can be

moved either interstate or intrastate. 48 U.S.C. § 13102 (15); 49 U.S.C § 13501.

Defendant Wing Keung sells and transports wholesale groceries.[5] The transported property is sold to various vendors and furthers the commercial enterprise of the business itself. Therefore, Wing Keung is the owner of the property being transported to further a commercial enterprise. Under the definitions of the MCA, Wing Keung is a "motor private carrier" such that its employees may still fall within the MCA exemption.

While it is not required that all the employer's trucks satisfy the weight requirement in order for some or all employees to be exempt under the MCA, it does narrow the inquiry. Here, the parties stipulated that all trucks owned by defendant Wing Keung Enterprises satisfied the weight requirements of the MCA exemption. See Hr'g Tr., Jan. 12, 2016; Ct. Ex. 3, Defs' Answer to Ques. 3(g) in Order, Jan 7, 2016  (ECF No. 66) (providing that all trucks weighed over 10,000 pounds); see also Order by Judge Weinstein dated Jan. 21, 2016 at p. 2 (ECF No. 75) (recognizing that the parties stipulated to the weight requirement and citing to same). Therefore, the TCA does not apply here.

### b.  Did Plaintiffs Perform "Safety Affecting Activities"

As Wing Keung was a motor private carrier, I next consider whether the driving and loading activities performed by each individual plaintiff qualified as "safety-affecting activities" within the meaning of the MCA exemption. As addressed above, both drivers and loaders are specifically described as groups engaged in "safety-affecting activities" within the DOL regulations. 29 C.F.R. § 782.2(b)(3). As the Supreme Court and the DOL guidance explicitly recognize driving as a "safety affecting activity," courts assume driving affects safety and solely examines how much driving in *interstate* commerce is necessary for employees to fall within the MCA exemption.

---

[5] See e.g. Bilyou v. Dutchess Beer Distrib., Inc., 300 F.3d 217, 225 (2d Cir. 2002) (discussing how plaintiff's argument that defendant was a wholesaler, and therefore not a "transporter" fails under the MCA).

Courts have had difficulty defining a "loader" and a loader's effect on safety. The DOL guidance articulates that a loader directly affects the vehicle's safety of operation if the loader "has responsibility when such motor vehicles are being loaded, for exercising judgment and discretion in planning and building a balanced load or in placing, distributing, or securing the pieces of freight in such a manner that the safe operation of the vehicles on the highways in interstate or foreign commerce will not be jeopardized." 29 C.F.R. § 782.5(c). In recognition of the Supreme Court's holding in Pyramid Motor Freight, the DOL further clarified that:

> mere handling of freight at a terminal, before or after loading, or even the placing of certain articles of freight on a motor carrier truck may form so *trivial, casual, or occasional a part of an employee's activities,* or his activities relate only to such articles or to such a limited handling of them, that his activities will not come with the kind of "loading" which directly affects "safety of operation."

29 C.F.R. § 782.5(c) (emphasis added) (quoting, Pyramid Motor Freight, 330 U.S. at 708).

Khan v. IBI Armored Services, Inc.[6] involved an employee who prepared goods to be loaded at a terminal. Khan made clear that where an employee solely prepares goods or pallets to be loaded, but does not actually load the goods, the employee's job does not constitute "safety-affecting activity." That is because such activity is more properly described as "packing" rather than "loading." While struggling to delineate the contours of the MCA exemption for loaders, the court recognized that the plaintiff employees in Khan made no decisions regarding where goods were to be loaded on the trucks. Id. However, the court was quick to specify that "the *loading* or rearrangement of cargo on a truck is obviously related to the safe operation of that vehicle on a highway" and therefore, in the court's perception, "employees who *actually* 'load' [the vehicles] fall within the Motor Carrier Exemption." Id. at 457 n. 10 (emphasis added). This would include employees who load the truck but do not exercise discretion about where to place items.

---

[6] Khan v. IBI Armored Services, Inc., 474 F. Supp. 2d 448, 459 (E.D.N.Y. 2007).

The court in McBeth[7] considered the application of the exemption where plaintiffs primarily handled freight before and after it was loaded into trucks, but also very occasionally loaded the trucks, without exercising any discretion as to the placement of the cargo. There, the court held that "consideration of the Plaintiffs' duties established that to the extent that either was involved in the loading of parts, such activities were nothing more than a 'trivial, casual, or occasional a part' of their activities, so that neither [employee] could be properly categorized as loaders who are not entitled to the protection of the FLSA." Id. at 391.

In accordance with these decisions, although the DOL's interpretations of the MCA exemption are helpful in synthesizing Supreme Court guidance on the subject, they are not entitled to any special deference. In McBeth, the court, following the Supreme Court's guidance in Pyramid Motor Corp., found that the loading activities performed by the plaintiffs were a "'trivial, casual, or occasional part' of their activities" so that the plaintiffs could not be *properly* categorized as loaders. Id. In coming to that conclusion, the McBeth court also considered whether plaintiffs exercised discretion as to the placement of the load. However, the court did not hold that the exercise of discretion was determinative to the question of whether plaintiffs fell under the exemption. Rather, the employees in McBeth performed so little loading that the Court felt it was necessary to evaluate whether this minimal amount of loading was truly *enough* of a "safety-affecting activity" such that the employees might be truly categorized as "loaders." Where an employee infrequently loads a vehicle, it is necessary to examine whether the employee exercised discretion and had enough of an impact on safety that he still can be properly characterized as a "loader" to fall within the MCA exemption. Thus, where loading constitutes a very small portion of an employee's duties, it is necessary to consider whether the employee also exercised discretion as to the placement of the load.

---

[7] McBeth v. Gabrielli Truck Sales, Ltd., 768 F. Supp. 2d 383 (E.D.N.Y. 2010).

Further, as the court in <u>Khan</u> found, if an employee regularly loads vehicles as a natural and integral part of his job, even at the direction of a supervisor, it is, and must be, "a safety-affecting activity." The Supreme Court's holding in <u>Levinson</u> requires that conclusion.[8] As the <u>Khan</u> court stated, it is obvious that the proper loading of a vehicle is related to the safe operation of that vehicle on the highway. In the instant case, plaintiffs were properly labelled as "loaders." Their every day job duties consisted entirely of loading trucks, riding on the trucks to their destination, unloading the trucks, and returning with the trucks to defendants' warehouse.

Plaintiffs, in an overly broad reading of <u>McBride</u> and a misreading of the DOL guidance contained in 29 C.F.R. § 782.5, argue that in order to fall within the MCA exemption as a "loader," plaintiff *must* have exercised judgment and discretion in planning and building a load. (Def's Memo in Opp. at p. 6; ECF No. 15.)[9] However, plaintiffs' reading of the DOL guidance fails to give meaning to the entire sentence.[10] The relevant section of 29 C.F.R § 782.5 reads:

> A "loader" may be called by another name, such as "dockman," "stacker," or "helper," and his duties will usually also include unloading and the transfer or freight between the vehicles and the warehouse, but he engages, as a "loader," in work directly affecting "safety of operation" so long as he has responsibility when such motor vehicles are being loaded, for exercising judgment and discretion in planning and building a balanced load *or* in placing, distributing, or securing the pieces of freight in such a manner that the safe operation of the vehicles on the highways in interstate or foreign commerce will not be jeopardized.

29 C.F.R § 782.5 (emphasis added). Plaintiffs read this section as requiring that a "loader" exercise judgment and discretion during his duties in order to qualify as a "loader." However, the

---

[8] <u>See</u> <u>Levinson</u>, 330 U.S. at 662-70 (1947) (detailing the Interstate Commerce Commission's findings on loaders and their effects on safety of interstate vehicle travel – specifically that, "the Commission, in in [its] latest and most informative decision, found that the classes of activities which it defined as those of mechanics, loaders and helpers affect the safety of operation of motor vehicles and that, therefore, employees engaging in such classes of activities are subject to the Commission's power to prescribe their qualifications and maximum hours of service." The Court then states that it "see[s] no reason to question [the Commission's] considered conclusion that the activities of full-duty drivers, mechanics, loaders and helpers, as defined by it, affect safety of operation of the carriers by whom they are employed.").

[9] Defendants' submission is not paginated. The Court therefore refers to the ECF pagination.

[10] Additionally, the DOL guidance is just that – guidance. It is not a legally binding regulation. It must be read in conjunction with the Supreme Court case law it summarizes.

plain language states that a loader *either* has responsibility to exercise judgment and discretion in planning and building a balanced load *or* has responsibility in placing, distributing, or securing the freight. Simply stated, a loader is an employee who actually loads freight (either under the direction of a supervisor or on his own), or an employee who plans and builds a safe load, even if he directs another employee to actually move the freight. This reading of the regulation, in addition to giving full effect to the words of the guidance itself, comports with the purpose of the MCA and the Supreme Court's holding in <u>Levinson</u> recognizing that a loader impacts the safety of a vehicle. Further, as the <u>Khan</u> court stopped just short of fully articulating, it would violate common sense for the definition of a "loader" to fail to include an employee, who as a regular and natural part of his job duties, actually loads the truck. An employee who actually and regularly loads the truck clearly has a significant impact on the safe operation of the vehicle. Even without exercising any discretion, plaintiffs are expected to follow the directions of a supervisor and correctly load a vehicle, which has a tremendous impact on the safety of the vehicle while it is in transit.

Unlike here, in <u>McBride</u>, the court was faced with a situation where the employees very infrequently loaded and unloaded vehicles – such that it was not a daily, or even a "natural" part of their job duties. Faced with those facts, the <u>McBride</u> court turned to the second description of a "loader"– an employee who exercises judgment and discretion in planning and building a balanced load. The court did this to determine how often the employees actually engaged in the activities of a "loader," (either by loading or by planning the load), in order to see if this constituted enough of their time that they could be classified as "loaders."

Here, the loading plaintiffs performed is exactly the type of safety affecting activity the Court considered sufficient in <u>Levinson</u>. The plaintiffs here who performed these activities

18

"moved the goods from store shelves to trucks as shipping staff directed." (Q. Liu Decl. ¶8 (ECF No. 19).) The employee would then get into the truck, sit in the passenger seat, and travel with the truck to its destination. Once there, "the driver would direct [the employee] to remove whatever goods that the customer ordered from the truck. [The employee] then unloaded the goods and moved goods into the customer's store." (Id.) Rather than a small or insignificant portion of their duties, the plaintiffs who were loaders were *solely* responsible for loading and unloading the truck. The loading performed by plaintiffs therefore constituted a "safety-affecting" activity within the meaning of the MCA. Consequently, plaintiffs' job duties place them within the Motor Carrier Act exemption if they performed these duties on vehicles transporting property in interstate commerce.

### c.  Time Periods When Plaintiffs Worked Only on Intrastate Routes

The MCA exemption applies to the periods during which plaintiffs only worked intrastate routes. As outlined above, courts generally employ a week by week approach in examining what duties and responsibilities were expected of the employee and whether those activities directly affected the safety of operation of motor vehicles in interstate commerce. Even with the week by week approach, the Court should still focus on the overarching characteristics of the plaintiff's employment. Further, as previously addressed, since the *bona fide* duties of the plaintiffs here placed them within the group of "loaders," the question is whether they were "*likely to be called upon* in the ordinary course of [their] work to perform, either regularly or from time to time" loading duties on vehicles involved in interstate travel. 29 C.F.R. § 782.2(b)(3); <u>see</u> <u>e.g.</u> <u>Dauphin</u>, 544 F.Supp.2d at 275. Further, there is the additional consideration, argued by defendants here, that even if the court finds that plaintiffs were not likely to be called to perform their duties on vehicles on intrastate routes, they are still exempt because defendants' goods were

"involved in a continuity of movement in the flow of interstate commerce." Bilyou, 300 F.3d at 223.

"Whether the transportation is of an interstate nature can be 'determined by reference to the intended final destination' of the transportation when that ultimate destination was envisaged at the time the transportation was commenced." Bilyou, 300 F.3d at 223-24 (quoting Project Hope v. M/V IBN SINA, 250 F.3d 67, 74 (2d Cir. 2001)). Crucial to this determination, is the shipper's intention at the time of the shipment and whether the shipper intended for the goods to be transported beyond the point the employee handles them to a terminal point that would require interstate transportation (either to or thru another state). See Bilyou 300 F.3d at 224 (citing Klitzke v. Steiner Corp., 110 F.3d 1465, 1469 (9th Cir. 1997) ("Whether transportation is interstate or intrastate is determined by the essential character of the commerce, *manifested by shipper's fixed and persisting transportation intent at the time of shipment*…") (citation omitted) (emphasis in original)); Foxworthy v. Hiland Dairy Co., 997 F.2d 670, 672 (10th Cir. 1993) ("Crucial to a determination of the essential character of a shipment is the shipper's fixed and persisting intent at the time of shipment.")). The DOL guidance also identifies the shipper's intent regarding an ultimate destination at the time the goods were shipped as determinative. See 29 C.F.R. § 782.7.

Defendants argue that the goods Wing Keung transports are involved in a "continuity of movement in the flow of interstate commerce." Defendants state that the goods plaintiffs loaded included "goods sourced from places outside of New York." Defendants argue that: "[t]hese goods were ultimately intended by either the seller or WK to be destined for shipment to or through New York, such that their transport forms part of a 'practical continuity of movement' across State lines from the point of origin to the point of their destination. For example, WK

20

purchases 150,000-200,000 chickens from Perdue Farms in Maryland, which are ultimately intended by either the seller or WK for delivery to [or] distribution among restaurants in and outside of New York." (Defs.' Memo of Law at p. 6 (ECF No. 13-2); Chan Aff. ¶¶ 10, 11 (ECF No. 13-3)). Defendants argue that the fact plaintiffs were involved in goods sourced from outside of New York, including goods from Perdue Farms and "condiments, utensils, and containers from W Y Industries, [I]nc., in New Jersey" establishes a continuity of movement across state lines. (Spindler Aff. in Reply ¶ 17 (ECF No. 22-4)).

Defendants' factual allegations fall short of establishing that the goods were involved in a "continuity of movement in the flow of interstate commerce." First, defendants fail to specifically focus on the shipper's intent at the time the goods were shipped and instead assert generally that either the seller or Wing Keung "ultimately" intended the goods to be destined for shipment out of state. This conclusory statement is not supported by record evidence of the shipper's intent. Cases that have found goods to be involved in a "practical continuity of movement" often focus on whether the shipper has an intended final destination to a *specific* location out of state, including a standing relationship or a contractual agreement. See e.g. Bilyou, 300 F.3d at 225; Opelika Royal Crown Bottling Co. v. Goldberg, 299 F.2d 37, 41-4 (5th Cir. 1962), accord Bilyou, 300 F.3d at 224. When a defendant merely asserts that some goods have ended up out of state, absent any specific factual evidence, the defendant fails to demonstrate "a practical continuity of interstate movement" that would render plaintiffs exempt regardless of their routes. See e.g. Cruz v. AAA Carting and Rubbish Removal, Inc., 116 F.Supp.3d 232, 250 (S.D.N.Y. 2015) (denying summary judgment where defendants "assert generally that [the product transported] often has ended up out of state"); Hamilton v. Newburgh-Beacon Bus Corp., No. 14 CV 624 (VB), 2014 WL 7398908, at *5 (S.D.N.Y. Dec. 4,

2014) ("In the absence of *any* fact-specific evidence….the Court declines to conclude plaintiff's intrastate route constituted a practical continuity of interstate movement."). Here, as defendants have not established that the goods were part of a practical continuity of movement, plaintiffs must have been involved in safety-affecting activities on vehicles involved in interstate commerce in order fall within the MCA exemption.

Therefore, the court looks at whether interstate travel was a "natural, integral, and inseparable part of the employee['s] duties" and whether plaintiffs were likely to be called upon to perform work affecting interstate vehicles. Dauphin, 544 F. Supp. 2d at 275-75. Following the tide of district court decisions on the exemption, plaintiffs *can* still be exempt under the MCA for weeks when they did not work on vehicles travelling interstate routes if they were likely to be called upon to load vehicles on interstate routes. That said, if the amount of safety-affecting work a plaintiff actually did on an interstate route was so trivial as to be *de minimis*, then the exemption will not apply to that plaintiff.

## IV.     Application: Time Periods Each Plaintiff Was Exempt Under the MCA

Finally, I apply the MCA exemption standard to the four plaintiffs in this case: Chaohui Tang, ("Tang"), Jian Lin Li, ("Li"),[11] Qingze Liu, ("Q. Liu"),[12] and Jian Liu, ("J. Liu").[13] Li and

---

[11] Li is referred to as both "Jian Lian Li" and "Jianlian Li" by the parties.

[12] Q. Liu is referred to as both "Qingze Liu" and "Qing Ze Liu" by the parties. In their submissions, plaintiffs occasionally refer to "Qingze Liu" as "Qing."

[13] On April 15, 2015, Tao Xu and Kong Jun each filed a "Consent to become a party in a collective action." (ECF Nos. 40, 41.) The consent forms were filed in conjunction with plaintiffs' motion for preliminary certification of a collective action. As addressed *supra*, plaintiffs' motion for preliminary certification of a collective action was denied. Plaintiffs' counsel never separately sought to add these parties as plaintiffs and thus, they are not plaintiffs in this case. As plaintiffs Qingze Liu and Jian Liu share a common last name, the Court refers to these two plaintiffs by their last names. The Court also recognizes that plaintiffs occasionally invert Jian Liu's name and he is alternatively referred to as Jian Liu and Liu Jian. The Court refers to this employee as "J. Liu." (See e.g. J. Liu Aff. (ECF No. 54-3)).

J. Liu worked for defendants as drivers, while Tang and Q. Liu worked for defendants as loaders. (Amend. Compl. ¶¶ 6-8.)[14]

Defendants attempt to demonstrate that the plaintiffs were exempt during all the time periods of their employment because they each, at times, completed interstate trips. Defendants argue that Wing Keung assigned routes indiscriminately and therefore, plaintiffs were "likely to be called upon" to perform interstate travel even during the time periods when plaintiffs did not travel out of state at all. However, at oral argument on the motions for summary judgment, defendants submitted additional responses to specific questions by the court and confirmed that: "The drivers, driver's helpers and loaders were not randomly assigned to the out of state routes as it was beneficial for each driver, helper and loader to be familiar with the routes, and once trained for the route was kept on that route." (Ct's Ex. No. 4 (ECF No. 74)). As plaintiffs were not randomly assigned routes but rather kept the same routes for certain time periods, defendants have not demonstrated that interstate travel was a natural and integral part of plaintiffs' job duties during the periods they did not engage in interstate travel. Accordingly, as it is defendants' burden to prove the exemption applies, plaintiffs were only exempt under the MCA during the time periods in which the plaintiffs actually worked on vehicles which travelled out of the state.

Plaintiff Tang worked as a truck driver. Tang was employed by the defendant from September 2009 to November 2013 from "in or about September 2009 to November 2013." (Tang Aff. ¶ 2 (ECF No. 17); (Tang. Aff. ¶ 2 (ECF No. 54-1)).[15] Tang alleges that from September 2011 to "July or August 2012," Tang worked long distance routes to upstate New

---

[14] Tang alleges that he worked both as a driver and a loader during his employment at Wing Keung, however this has no bearing on the application of the MCA exemption.

[15] Tang's two submitted affidavits contain conflicting dates. In the first affidavit, Tang states he worked through November 2013; the second affidavit states Tang worked through September 2013. The amended complaint alleges that Tang worked through November 2013 and defendants have records for Tang through November 2013. (See e.g. Spindler Aff. ¶¶ 14, 15 (ECF No. 22)). The court therefore assumes the different dates are errors and that Tang worked through November 2013.

York, New Jersey, and Pennsylvania. (Tang. Aff. ¶ 4 (ECF No. 54-1)). Tang further alleges that

from September 2012 onward, Tang solely worked on intrastate routes. (Id at ¶ 5.) Most of

Tang's testimony is supported by defendants' records, but there are some conflicts. For all the

plaintiffs, defendants submit detailed handwritten route assignments. (See ECF No. 13, Exhibit

E.) Each assignment lists a route number for the trip plaintiff took. The route numbers

correspond to printed "AR Invoices"[16] which contain logs of the numbered trips. (See Ex. D1 –

E4 (ECF Nos. 13-9 through 13-16)). The AR invoices include the date of the delivery, the

customer to whom the delivery was made, the address of the customer, and the numbered route

(listed under "zone").

Defendants allege that Tang made interstate deliveries in June 2012 (to Pennsylvania), July

2012 (to New Jersey), January 2013 (to New Jersey), and January through November 2013 (to

Connecticut). Defendants' records of Tang's route assignments and the corresponding AR

Invoices confirm that he made a number of interstate trips during this time period – many for

repeat trips out of state.  (See Ex. D1; Ex. E1.) As Tang travelled out of state during these

periods, and could be expected to travel out of state during the weeks when he was likely to

repeat these trips, he is exempt under the MCA for those periods when he travelled interstate.

Thus Tang is not covered by the FLSA during the following periods: June through July 2012 and

January through November 2013. As defendants admit that drivers and loaders were not

randomly assigned to trips, they have not met their burden of establishing that interstate travel

was a natural and integral part of Tang's duties for the time periods when he did travel out of

state. Therefore, Tang may seek recovery for FLSA violations for the following time periods

---

[16] While never stated, the Court assumes that "AR" stands for "accounts receivable." The invoices were created in the regular course of defendants' business.  (Chan Decl. ¶¶ 7-9; ECF No. 13-3.)

when he was solely travelling intrastate: September 2011 through May 2012 and August 2012 through December 2012.[17]

Plaintiff Li alleges that he worked as a truck driver for plaintiffs during three distinct periods: from September 25, 2009 through December 2010; from May 2012 through January 8, 2013; and from August 1, 2013 through November 16, 2013. (Pls.' Amend. Compl. ¶ 6.) However, in Li's affidavit, in contrast to the amended complaint, Li makes no mention of this final period of employment from August through November 2013, even though he alleges he worked these months in the amended complaint. (Li Aff. ¶ 3 (ECF No. 54-2)). In the affidavit, Li states that all of his routes were within the state of New York – ranging from Queens, to Long Island, and upstate New York. (Li Aff. ¶¶ 4, 5 (ECF No. 54-2)). He states that in order to make these deliveries, he did not cross state lines. (Id. at ¶ 5.) Defendants agree that for the majority of Li's employment, he made deliveries only within the state of New York. (Spindler Aff. ¶¶ 19-21.) Defendants therefore have not demonstrated that Li was exempt under the MCA during these periods of employment.[18]

Plaintiff Q. Liu alleges that he worked as a loader, (or a "laborer and mover") for Wing Keung from July 2011 through May 2012. (Pls.' Amend. Compl. ¶ 7.) Unlike the other plaintiffs, Q. Liu did not submit an affidavit describing whether his routes were interstate or intrastate.[19] Plaintiffs' motion for summary judgment states that Q. Liu "went back to China, his testimony will be added when it is available." (Pls' Memo of Law at p. 19 (ECF No. 54).) Defendant's state

---

[17] This Report and Recommendation solely addresses the questions referred to me by Judge Weinstein. I do not address whether any of plaintiffs' claims would be barred under the applicable statute of limitations during the alleged time periods.

[18] However, notably absent from Li's affidavit is his employment from August through November 2013. Defendants allege, and their records confirm, that during this period, Li was assigned to routes in Connecticut and New Jersey and did in fact regularly travel out of state. (See Ex. D2; Ex. E2 (ECF No. 13).)

[19] The remaining three plaintiffs each submitted two affidavits. The first, submitted in opposition to defendants' motion for summary judgment, mostly focus on disputing the accuracy of the pay stubs submitted by defendants. The second, submitted in support of plaintiffs' motion for summary judgment, outline plaintiffs' recollections of when they worked interstate vs. intrastate routes.

that Q. Liu worked on interstate routes to New Jersey in June 2012 through August 2012. (Spindler Aff. ¶ 15 (ECF No. 22)). That said, defendants' records confirm that in June through August 2012, Q. Liu consistently took trips to New Jersey as part of his employment. Plaintiffs have proffered nothing to controvert this. Therefore, to the extent Q. Liu seeks to allege he is entitled to overtime wages from June through August 2012, Q. Liu was exempt under the MCA from the overtime provisions of the FLSA.

Plaintiff J. Liu alleges that he worked for defendants as a truck driver from October 2010 to July 2011 and from October 2012 to October 2013.[20] (J. Liu Aff. ¶ 2 (ECF No. 54-3)). J. Liu admits that from October 2010 through July 2011, his routes included trips to Connecticut. (Id. at ¶ 3.) Additionally, when he returned to work, he made trips to Connecticut and New Jersey from October 2012 to April 2013. (Id. at ¶ 4.) However, after that, J. Liu alleges he only worked on routes in New York until he left the job in October 2013. Therefore, J. Liu solely travelled intrastate during the period of May 2013 through October 2013. Defendants' records do not contradict this account. Rather, defendants attempt to again argue that interstate travel was a natural and integral part of plaintiffs' job duties even when plaintiffs only travelled intrastate. This argument fails for the reasons previously addressed. Therefore, J. Liu was exempt under the MCA for the majority of his employment – but not for the period of time from May to October 2013.

---

[20] The allegations in J. Liu's affidavit are different from the allegations in the amended complaint. In the amended complaint, J. Liu alleges that he worked for defendants for a shorter period – from October 2010 to *July 2010* and October 2012 to October 2013. (Pls.' Amend. Compl. p. 2, ¶ 8; p. 5, ¶ 7 (The court includes page numbers as the amended complaint includes multiple paragraphs with the same numbering)). Plaintiffs never moved to amend or correct the dates in the amended complaint. Nonetheless, defendants' records reflect that J. Liu worked during the period described in his affidavit as he was given route assignments.

**CONCLUSION**

Defendants have established that the MCA exemption to the FLSA applied to plaintiffs' employment for certain periods of time. The time periods during which plaintiffs were exempt under the MCA are summarized below:

| Plaintiff | Time Periods Exempt | Time Periods Not Exempt |
|---|---|---|
| Tang | June through July 2012; January through November 2013 | September 2011 through May 2012; August through December 2012 |
| Li | August through November 2013 | September 2009 through December 2010; May 2012 through January 2013 |
| Q. Liu | June through August 2012 | July 2011 through May 2012 |
| J. Liu | October 2010 through July 2011; October 2012 through April 2013 | May 2013 through October 2013 |

Defendants have not met their burden of establishing that plaintiffs were exempt during the entire time they were employed. Defendants further argue that the time records and pay stubs demonstrate that they did pay plaintiffs in accordance with the minimum wage and overtime requirements. That portion of defendants' motion for summary judgment was not referred to me and is not addressed by this Report. I therefore recommend that defendants' motion for summary judgment should be granted in part and denied in part. Plaintiffs' cross-motion for summary judgment should be denied.

**FILING OF OBJECTIONS TO THIS REPORT AND RECOMMENDATION**

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b)(2) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report to file written objections.  See also Fed. R. Civ. P. 6. Such objections (and any responses to objections) shall be filed with the Clerk of the Court.  Any request for an extension of time to file objections must be made within the fourteen-day period. Failure to file a timely objection to this Report generally waives any further judicial review.  Marcella v. Capital Dist. Physicians' Health Plan, Inc., 293 F.3d 42, 46 (2d Cir. 2002); Small v. Sec'y of Health & Human Servs., 892 F.2d 15, 16 (2d Cir. 1989); see Thomas v. Arn, 474 U.S. 140 (1985).

SO ORDERED.

                                                   /S/

                                       LOIS BLOOM
                                       United States Magistrate Judge

Dated: July 11, 2016
       Brooklyn, New York